UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOHN R. DURSO, JOHN DEMARTINO,
MURRAY J. MORRISSEY, JEFFREY LAUB and
FRED WREN as Trustees and Fiduciaries of the
LOCAL 338, RWDSU HEALTH AND WELFARE
FUND, et al.,

                              Plaintiffs,                            **REPORT &**
                                                                                   **RECOMMENDATION**

                              -against-

                                                                                          05-CV-6065 (NG) (JMA)

130-10 FOOD CORP., d/b/a TRADE FAIR
SUPERMARKETS, a/k/a TRADE FARE
SUPERMARKETS, et al.,

                              Defendants.
------------------------------------------------------------------X

A P P E A R A N C E S:

William Anspach, Esq.
Elise S. Feldman, Esq.
Friedman & Wolf
1500 Broadway Suite 2300
New York, NY 10036
      *Attorneys for Plaintiffs*

Frank M. Graziadei, Esq.
130 Water Street
New York, NY 10005
      *Attorney for Defendants*

**AZRACK, United States Magistrate Judge**:

      Plaintiffs commenced this action against defendants pursuant to sections 502 and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132 and 1145, to recover contractual contributions and associated payments allegedly owed to union employee benefit plans administered by plaintiffs. Both parties have moved for summary judgment. The Honorable Nina Gershon, United Stated District Judge, referred the parties' motions to me for a

1

report and recommendation. For the reasons discussed below, I respectfully recommend that the Court grant plaintiffs' motion for summary judgment on liability, deny it on damages, and deny defendants' motion for summary judgment in its entirety.

## I. **BACKGROUND**[1]

Plaintiffs are trustees and fiduciaries ("plaintiffs" or "Trustees") of several employee benefit funds (the "Funds") maintained by Local 338 of the Retail, Wholesale and Department Store Union ("Local 338" or the "Union"). The Funds are administered pursuant to individual Agreements and Declarations of Trust ("Trust Agreements") and are maintained for the purpose providing retirement, health, welfare and vacation and sick leave benefits to eligible participants. Defendants are ten separately incorporated entities doing business as Trade Fair supermarkets ("Trade Fair") and their sole owner Farid Jaber ("Jaber").

**A. The Collective Bargaining Agreement between Trade Fair and Local 338.**

Over the past twenty years, Trade Fair has been a signatory to a series of collective bargaining agreements with Local 338, each with a definite expiration date. Each time an agreement expired, the parties negotiated a replacement. This action is based on the collective bargain agreement covering the period July 17, 2002 through October 4, 2006 (the "CBA"). The CBA, which incorporates the Trust Agreements by reference, required Trade Fair to make monthly contributions to the Funds on behalf of each of its employees performing covered work at rates set forth in the CBA. Article I of the CBA defines "employees" as "all of [Trade Fair's] present and future full-time and part-time employees (other than store managers, butchers and meat wrappers) . . . ."[2] The parties agree that by its terms, the CBA covers all Trade Fair

---

[1] The facts are taken from the parties Rule 56.1 statements and exhibits as cited. Disputes are noted.

[2] Trade Fair's butchers and meat wrappers are represented by Local 342 of the United Food and Commercial Workers Union ("Local 342") under a separately negotiated collective bargaining agreement.

employees, except those that are explicitly excluded, regardless of the employees' membership in Local 338. Under the CBA, Trade Fair was also obligated to submit monthly remittance reports identifying its covered employees. The remittance reports enabled the Trustees to determine the contributions owed for each month. Lastly, Trade Fair was required to maintain pertinent payroll records and to submit to periodic audits of these records so that the Trustees could verify Trade Fair's compliance with the CBA. In the event Trade Fair failed to make a required contribution, the CBA required it to pay interest, liquidated damages, attorneys' fees and audit fees. If Trade Fair failed to submit to an audit, the CBA entitled the Funds to additional contributions of fifty percent above the reported monthly figures.

**B. Trade Fair's Engagement of PSI.**

In 2002, John Durso ("Durso"), President of Local 338 and one of the plaintiff Trustees, and Jaber met to negotiate a new CBA. According to defendants, Durso had been aware at this time that since the 1980s, Local 338 had been ignoring Trade Fair's failure to make fund contributions on behalf of non-Local 338 workers even though these workers were covered by the various CBAs in force between the parties. Jaber testified that during the negotiations Durso told Jaber that an audit was coming up, that Jaber advised Durso that he was going to put his non-Local 338 employees in a lease company and that Durso, who did not object to Jaber's advisement, responded, "do what you have to do." (Graziadei Aff. Ex. B at 483–84.) According to defendants, Durso advised Jaber about the impending audit so that Jaber could arrange for Trade Fair's approximately three hundred non-Local 338 workers to be excluded from the audit's accounting of employees on whose behalf Trade Fair was required to contribute. Plaintiffs admit that Durso informed Jaber of the audit but deny that he did so in order to provide Jaber an opportunity to exclude workers.

In response to news of the upcoming audit, Trade Fair entered into a contract with Payroll Strategies, Inc. ("PSI") under which Trade Fair transferred its non-Local 338 workers to PSI and then, according to defendants, "leased" them back to work at Trade Fair supermarkets. Both before and after Trade Fair's engagement of PSI, Trade Fair used a company called ADP to help administer its payroll. ADP assisted with tasks such as handling and issuing employee paychecks. Plaintiffs assert that PSI and ADP provided the same service, namely payroll administration, and that all Trade Fair workers remained Trade Fair employees even after Trade Fair engaged PSI. The parties agree that subsequent to the lease arrangement, Trade Fair remained exclusively responsible for hiring, supervising, setting wages for, and terminating the leased workers. While PSI paid the leased workers with checks drawn from its own account, Trade Fair reimbursed PSI for the paychecks it issued. Trade Fair supervisors told workers who inquired about the change in company name on their paychecks from ADP to PSI that Trade Fair had changed payroll companies. PSI never had any clients other than Trade Fair.

**C. The Audit.**

Beginning in October 2003, around the same time that Jaber began his relationship with PSI, plaintiffs began making written requests for an audit. After defendants declined to cooperate, plaintiffs commenced this action in December 2005 seeking an order compelling Trade Fair to submit to an audit and, in the event the audit revealed underpayments, all amounts owed for unpaid contributions and associated penalties. Defendants subsequently acquiesced and an audit was completed in September 2007. The audit covered the period January 1, 2003 through December 31, 2005 (the "Audit Period"). In response to the audit request, Trade Fair submitted earnings records, cash disbursement books, federal and state tax returns, termination notices and PSI records covering a portion of the Audit period. Trade Fair did not submit any

4

records for January 2003 through September 2005 because, according to Trade Fair, these records were damaged in a flood at its headquarters. Consequently, the audit relied on the records provided by Trade Fair for a portion of the Audit Period and calculated the amount owed for the period for which there were no records based on the formula designated by the CBA for situations in which an employer fails to submit to an audit. Using this formula and comparing the payroll records to the remittance reports submitted by Trade Fair for the same period, the audit concluded that Trade Fair owed the Funds an additional $1,421,462.75. The audit included workers purportedly "leased" from PSI in calculating Trade Fair's total liability.

## II. **DISCUSSION**

Both parties seek summary judgment. Plaintiffs contend that, as a matter of law, the CBA and ERISA entitle the Funds to the full amount of unpaid contributions and associated penalties calculated by the audit, including contributions on behalf of workers "leased" from PSI. Defendants contend that they are not liable for any additional payment because plaintiffs' claims are barred by the statute of limitations and because the Audit erroneously included Trade Fair workers that are not covered by the CBA.[3]

**A. Summary Judgment Standard**

Summary judgment should be granted if, after construing the evidence in the light most favorable to the opposing party, there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–50, 255 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). If it meets this burden, the opposing party must produce evidence that raises a material question of fact to defeat the motion. Fed. R.

---

[3] In Point IV of their motion for summary judgment, defendants also seek dismissal of plaintiffs' first cause of action, which seeks an order directing defendants to submit to an audit. However, since an audit was conducted subsequent to the filing of the complaint, defendants' motion with respect to the audit is moot.

5

Civ. P. 56(e); Miner v. Clinton County, N.Y., 541 F.3d 464, 471 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient" to defeat summary judgment. Anderson, 477 U.S. at 252. Rather, "there must be evidence on which the jury could reasonably find for the [opposing party]." Id. (emphasis added). The opposing party must set forth "concrete particulars" showing that a trial is needed. R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (citation and quotation marks omitted). "Conclusory allegations will not suffice." Delaware & Hudson Ry. v. Consolidated Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990). In considering the motion for summary judgment, the court may not weigh the evidence but must instead view the evidence in the light most favorable to the opposing party, draw all reasonable inferences in the opposing party's favor, and eschew credibility assessments. Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004) (citations and quotation marks omitted).

**B. Timeliness.**

Defendants assert that plaintiffs' claim for unpaid contributions is time-barred because plaintiffs knew of Trade Fair's alleged failure to pay required contributions in 1999 but did not file its claim until December 2005. Delinquent contribution claims brought under ERISA are subject to New York State's six-year statute of limitations for breach of contract claims. Hanley v. Aperitivo Restaurant Corp., No. 97-CV-5768, 1998 WL 307376, at *7 (S.D.N.Y June 11, 1998). However, unlike New York, which sets the accrual point at the date the injury occurred, under the federal discovery rule, the limitations period begins to run when the plaintiff knows or has reason to know of the injury that is the basis of the action. La Barbera v. R. Rio Trucking, No. 03-CV-1508, 2007 WL 2177063, at *3 (E.D.N.Y. July 27, 2007) (citations and quotation marks omitted); see also Connors v. Hallmark & Son Coal Co., 935 F.2d 336, 341–44 (D.C. Cir.

1991) (Ginsburg, J.). The defendant bears the burden of establishing that the limitations period has expired. Overall v. Estate of Klotz, 52 F.3d 398, 403 (2d Cir. 1995).

Here, the underlying injury in plaintiffs' claim is Trade Fair's underpayment of Fund contributions. Accordingly, the injury could not have occurred, let alone accrued, until the monthly contribution due dates passed without payment. See, e.g., Brown v. R.D.F. Transport Corp., No. 95-CV-2056 F. Supp. 2d, 1998 WL 713807, at *4 (E.D.N.Y. Oct. 7, 1998). Plaintiffs seek contributions that were due from January 2003 through December 2005. Therefore, this complaint, which was filed in December 2005, is well within the limitations period. Defendants argue that plaintiffs should have known of the underpayment in 1999 because none of the "leased" workers were Local 338 members prior to Trade Fair's engagement of PSI and Durso was aware that Trade Fair had not been paying contributions on their behalf since that time. However, each month of underpayment constitutes the occurrence of a separate actionable injury. Defendants cite no authority for the proposition that plaintiffs are required to foresee a continuing violation or that plaintiffs' failure to assert underpayment claims in the past bars their ability to seek redress for subsequent breaches.

**C. Liability**

Section 515 of ERISA requires Trade Fair to make Fund contributions as set forth by the terms of the CBA. 29 U.S.C. § 1145. The parties agree that the CBA bound Trade Fair to contribute to the Funds on behalf of all of its employees except store managers, butchers and meat wrappers. However, plaintiffs contend that workers purportedly "leased" from PSI are, in fact, Trade Fair employees covered by the CBA while defendants assert that Trade Fair is not liable for contributions on behalf of "leased" workers because these workers are PSI employees rather than Trade Fair employees. Thus, the only dispute as to whether Trade Fair violated

Section 515 is whether the workers Trade Fair purportedly "leased" from PSI are Trade Fair employees within the meaning of ERISA.

In <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 319 (1992), the Supreme Court construed "the term 'employee' as it appears in § 3(6) of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 834, 29 U.S.C. § 1002(6), and read it to incorporate traditional agency law criteria for identifying master-servant relationships." Accordingly, in order to avoid the statutory application, a business entity must actually establish, and not merely structure, its relationship with workers so as to avoid ERISA liability. Employment status for purposes of ERISA coverage is not determined solely by the parties and certainly not unilaterally by one party. See <u>McLellan v. E.I. Dupont de Nemours & Co.</u>, No. 04-CV-314, 2006 WL 3751583 at *10 (W.D.N.Y. Dec. 19, 2006); <u>Baraschi v. Silverwear, Inc.</u>, No. 01-CV-11263, 2002 WL 31867730 at *4 (S.D.N.Y. Dec. 23, 2002) (<u>citing</u> <u>Sharkey v. Ultramar</u>, 70 F.3d 226, 232 (2d Cir. 1995)). Rather, the Court must consider "the hiring party's right to control the manner and means by which the product is accomplished." <u>Darden</u> at 323–24. Factors relevant to this inquiry include:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

<u>Id.</u> (citations omitted). Although no single factor may be determinative, the greatest emphasis should be placed on the extent to which the hiring party controls the manner and means by which

8

the worker completes his or her assigned tasks. Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, 114 (2d Cir. 2000).

Here, the record establishes that the "leased" workers fall squarely within the Darden formulation of an employee covered by ERISA and Trade Fair has submitted nothing to the contrary other than Jaber's bare declaration that the workers at issue were leased and therefore not his employees. When Trade Fair engaged PSI, nothing changed with respect to its workers except that they received their paychecks from PSI instead of ADP. At least two workers inquired about the change and were advised that a new payroll company had been engaged. The record discloses no change with respect to every other aspect of the relationship between Trade Fair and its workers. According to the contract with PSI, its only client, Trade Fair, exclusively supervises, directs and controls the workers. Workers receive instructions, equipment, and training from Trade Fair. They are given hours and assignments by Trade Fair. Trade Fair sets wages, raises and benefits, including sick days, vacation days and holidays, and if a worker wants time off, the worker approaches a Trade Fair manager. Trade Fair decides whether to transfer a worker. Trade Fair solely imposes discipline. It fires employees by advising PSI to replace a worker. PSI "hires" only individuals as directed by Trade Fair, after an application has been submitted at Trade Fair. Thus, under the Darden factors, Trade Fair did not lease workers and its relationship with the "leased" workers is that of employer/employee within the meaning of ERISA.[4]

Despite Darden, defendants argue that the contract is ambiguous as to on whose behalf they must make fund contributions and urge the Court to rely on extrinsic evidence to determine the scope of that term. Specifically, defendants argue that "[l]ike the managers, butchers and

---

[4] This finding is consistent with the decision of Administrative Law Judge Steven Davis in Local 338's National Labor Relations Board case against Trade Fair in which Trade Fair also disavowed the leased workers in response to charges of unfair labor practices.

meat wrappers, the parties have agreed to exclude the PSI employees from the bargaining unit." Def. Mem. Opp. Summ J. at 5. The only evidence of that "agreement" is the parol evidence offered by Jaber that Durso remarked "do what you have to do" after Jaber first mentioned the idea of leasing employees during the 2002 CBA negotiations. This argument fails for a number of reasons. First, as discussed above, Trade Fair did not actually lease any workers and the purportedly leased workers were, under ERISA standards, Trade Fair employees.

Second, under the applicable rules of contract construction, evidence of Durso's statements during the 2002 negotiations is not admissible and therefore of no consequence. The usual rules concerning parol evidence apply to collective bargaining agreements. Before a Court may consider extrinsic evidence to determine the meaning of contract language, it must conclude that the language is ambiguous. See, e.g., DeVito v. Hempstead China Shop, Inc., 38 F.3d 651, 654 (2d Cir. 1994). Whether there is any ambiguity in the contract language is a question of law. See, e.g., Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir. 1998). "Written terms are ambiguous only if multiple reasonable interpretations exist." Trustees, etc. v. Flores, 519 F.3d 1045, 1047 (9th Cir. 2008). "If the contract language is clear, summary judgment is appropriate." Plumbers, etc. v. Mauro's Plumbing, 84 F. Supp. 2d 344, 352 (N.D.N.Y. 2000) (citations omitted). Additionally,

> in determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning, giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish. There may not be any genuine issue regarding the inferences to be drawn from the language. The inferences may not be reasonably susceptible to having more than one meaning ascribed to them.

Healy v. Rich Prod. Corp., 981 F.2d 68, 72 (2d Cir. 1992) (quotations and citations omitted). Trustees, etc. v. River Trucking, etc., No. 03-CV-3659, 2005 WL 2290570 at *4 (E.D.N.Y. Sept.

10

20, 2005); Rhode Island Carpenters, etc. v. Trevi Icos Corp., 474 F. Supp. 2d 326, 335 (D. R.I. 2007). Defendants assert that the ambiguity arises from the circular definition of the term "employee." However, that definition is neither circular nor ambiguous. See, e.g., Boards of Trustees, etc. v. Blaze Construction, Inc., No. 01-CV-1068, 2002 WL 31951267 at *5 (S.D. Ohio Dec. 11, 2002); Mauro's Plumbing, 84 F. Supp. 2d at 354; Demolition Workers Union v. Mackroyce Contracting Corp., No. 97-CV-4094, 2000 WL 297244 at *4 (S.D.N.Y. Mar. 22, 2000). The provision specifically removes store managers, butchers and meat wrappers, from all of the defendants' future and present full-time and part-time employees in terms of establishing liability for contributions.

Finally, even if the contract were ambiguous, the conversation cited by defendants does not evidence a change in the terms of the CBA with respect to exempted employees. The words "do what you have to do," even when spoken in the context of CBA negotiations, an upcoming audit, and Jaber's leasing plan, in no way convey endorsement or acquiescence. Rather, "do what you have to do" may only be understood as a promise that if you do what you have to do, I will do what I have to do. It is a declaration, not of forbearance, but enforcement.

Defendants also contend that in light of the absence of a provision prohibiting the subcontracting of bargaining unit work in the CBA, Durso's knowledge of the subcontracting and failure to object amounts to a waiver of the CBA with respect to the leased workers. However, defendants have failed to prove that Durso's reaction, or lack of reaction, to Jaber's leasing scheme constitutes a waiver. However, even if it did, they cannot overcome the fact that, under the controlling Darden standard discussed above, the leased workers were in actuality Trade Fair "employees" within the meaning of ERISA. Similarly, defendants' contention that they "did not knowingly sign a contract which would prohibit [them] from subcontracting," does

11

not change that for purposes of ERISA obligations, defendants did not actually subcontract workers. Additionally, the parties' relationship is not governed by a single CBA. Rather, they have negotiated a series of separate CBAs with distinct expiration dates. Defendants argue that plaintiffs waived something in one of these CBAs but cite no authority for the proposition that a waiver effective for one CBA continues to each subsequent CBA with respect to obligations or liabilities subject to ERISA. For the same reason, defendant's argument that the Union waived rights under subsequent CBAs by not enforcing the right to contributions on behalf of non-Local 338 workers in the past is also unavailing.

**D. Damages.**

In addition to their assertions regarding the "leased" workers discussed above, defendants urge the Court to deny plaintiffs' motion for summary judgment because the audit includes contributions for employees who are explicitly exempt from contribution coverage under the CBA, i.e. butchers, meat wrappers and managers. Butchers and meat wrappers are represented by Local 342 of the United Food and Commercial Workers Union ("Local 342"). According to defendants, all Trade Fair meat department employees were Local 342 butchers and meat wrappers and consequently were among the workers that were explicitly exempt from the CBA with Local 338. However, plaintiffs' auditor indicated that he discovered meat department workers that were not listed on Trade Fair's remittance reports to Local 342 and assumed that all such employees performed work covered under the Local 338 CBA. While this may have been a reasonable assumption, it creates a genuine issue of material fact concerning whether butchers and meat wrappers were erroneously included in the audit. The audit, which does not list the positions of the employees it names, also included Trade Fair employees identified by Jaber during his deposition as managers, such as "S. Eid", "B. Jaber", and "M. Jaber." Consequently,

in light of Jaber's testimony, a reasonable trier of fact could conclude that managers, who were also explicitly excluded by the CBA, were included in the the audit's calculation of defendants' total underpayment. Thus, viewing the facts in the light most favorable to the defendants, as the opposing parties, the record does not entitle the plaintiffs to summary judgment on damages.

### III. **CONCLUSION**

Based on the foregoing, I respectfully recommend that your Honor grant plaintiffs' motion for summary judgment on liability, deny summary judgment on damages, and deny defendants' motion for summary judgment in its entirety.

### **NOTICE**

Any objections to this report and recommendation must be filed on ECF within ten (10) days of the date of entry of this report and recommendation. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

SO ORDERED.

Dated: August 11, 2009
      Brooklyn, New York

/s/
JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE